IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DIONICO BLANCO, JR.<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:09-cr-1 CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

This matter is before the court on Defendant Dionico Blanco's ("Blanco") Motion to Dismiss for Outrageous Governmental Misconduct. Blanco contends the government acted outrageously by accepting statements from an informant as true without having independent corroboration and then having that informant "cook" crack cocaine and deliver it to Blanco when Blanco ordered powder cocaine. The court held an evidentiary hearing on this issue on May 27, 2010, August 2, 2010, and August 19, 2010. For the reasons stated below, the court finds the government did not act outrageously, and therefore, denies Blanco's motion to dismiss.

## BACKGROUND

On January 10, 2005, Blanco pled guilty to possession of five or more grams of crack cocaine.[1] He subsequently was sentenced to seventy-months imprisonment and thirty-six months

---

[1] Minute Entry (Jan. 10, 2005) (Dkt. No. 52 in Case No. 1:03-cr-131).

of supervised release.[2] In approximately July 2008, Blanco was released to a half-way house.[3]

In November 2008, the Weber Morgan Narcotics Strike Force was involved in investigating a suspected drug operation. Mike Tribe ("Agent Tribe") was the lead agent. His supervisor, Troy Burnett ("Agent Burnett"), Kevin Grogan ("Agent Grogan"), and DEA Special Agent Matthew Fairbanks ("Special Agent Fairbanks"), among others, also participated in the investigation. On November 26, 2008, the Strike Force conducted a search of two homes associated with Elvis Dupree ("Dupree"). They found powder and crack cocaine, marijuana, a digital scale, a firearm, and a bullet proof vest.[4] Based on this evidence and Dupree's prior conviction for drugs, Dupree was facing significant prison time.

To obtain leniency, Dupree agreed to act as a confidential informant. Dupree disclosed the names of other individuals involved in the operation, including the name "June Bug."[5] Agent Burnett knew that June Bug referred to Blanco because he was the arresting officer in Blanco's prior drug charge and had had other dealings with him over the years.[6] Dupree also explained how the operation worked. He would receive money from Blanco, pool it with his own, and then take the money to Jerris Jones ("Jones"). Jones would then add his own money into the pool and purchase

---

[2] *See* Judgment, at 1 (Apr. 14, 2005) (Dkt. No. 60) and Order (Mar. 28, 2008) (Dkt. No. 81) in Case No. 1:03-cr-131. All subsequent footnotes that reference a docket number are for the docket in the present case, Case No. 1:09-cr-1.

[3] Hr. Tr. Vol. III, 43:5–10.

[4] Ogden Police Dep't Gen. Offense Hardcopy, 7 (Dkt. No. 146, Ex. 1).

[5] Hr. Tr. Vol. III, 10:19–22.

[6] *Id.* at 10:21–22; 11:10–12:19.

powder cocaine from a Latino group in Salt Lake City, Utah. Jones would take out his portion of the powder cocaine and deliver the remainder to Dupree. Dupree would then take Blanco's portion of the powder cocaine, convert it to crack cocaine, and deliver the crack cocaine to Blanco.[7] This process was repeated about every three weeks and had occurred about three times before Dupree was arrested.[8]

Besides learning from Dupree that Blanco was involved in crack cocaine rather than powder cocaine, Agent Grogan had learned the same information from Adam Hemmelgarn following the execution of a search warrant on him.[9] Hemmelgarn and Dupree ran A and E Clothing together.[10] In the presence of an Alcohol Tobacco and Firearms agent and Hemmelgarn's defense counsel, Hemmelgarn stated that about eight ounces of some crack cocaine belonged to Blanco.[11] Agent Burnett testified that he also had independent corroboration that Blanco was trafficking in cocaine between August and December 2008. Following the arrest of a person for crack cocaine, the person stated that June Bug was slinging again.[12] Although "slinging" can refer to other drugs besides crack cocaine, it is a term commonly used to refer to crack cocaine.[13] The context in which the phrase was

---

[7] *Id.* at 25:17–26:7; 53:22–54:5; 67:8–23.

[8] *See id.* at 31:23–25, 92:12–19.

[9] In the hearing transcript, Hemmelgarn is referred to as Helmsgarde.

[10] Ogden Police Dep't Gen. Offense Hardcopy, 7 (Dkt. No. 146, Ex. 1).

[11] Hr. Tr. Vol. III, 68:10–69:5.

[12] *Id.* at 40:20–41:3.

[13] *Id.* at 49:4–23.

used, combined with Agent Burnett's prior encounters with Blanco, led him to conclude that Blanco was involved in crack cocaine again.[14] Despite this information that Agents Grogan and Burnett had about Blanco, neither reported the information to Blanco's probation officer for purposes of revoking his supervised release.

Instead, the Strike Force devised a plan for a reverse sting, where they would insert themselves into the operation and supply illegal drugs to Blanco. Between November 26, 2008 and December 18, 2008, Dupree had numerous telephone conversations with Blanco to set up a drug deal. The conversations were recorded and Blanco stated in them that "he was out of work and needed some work."[15] According to Dupree, "work" meant crack cocaine.[16] Agent Tribe testified he asked other individuals what "work" meant over the years of his career and they also stated it meant crack cocaine.[17]

Members of the Strike Force testified that when they inserted themselves into the operation, they wanted to carry out the drug deal in the same manner that it had always been done. They relied upon Dupree for the details of the operation and listened to the tape recorded conversations between Dupree and Blanco. They concluded that they needed to supply Blanco with crack cocaine rather than powder cocaine. In the past, Blanco had received four to four-and-a-half ounces of crack cocaine, according to Dupree. For the drug deal at issue, however, one tape recording indicates that

---

[14] *Id.* at 55:21–56:1.

[15] *Id.* at 105:3–11.

[16] *Id.* at 105:11–20.

[17] *Id.* at 105:15–19.

Blanco only ordered three ounces, but Dupree told him he could "slide for one and a half."[18]

The Strike Force, however, did not have four-and-a-half ounces of crack cocaine, so they decided to make it.[19] Special Agent Fairbanks informed Agent Burnett that it was permissible for the Strike Force to have Dupree make the crack because he knew how and would be operating with law enforcement.[20] The Strike Force obtained all the needed supplies for Dupree, and in the evening of December 17, 2008, Dupree was taken to the Ogden Police Officer Association Building.[21] They gave him 135.7 grams of powder cocaine.[22] To that, Dupree added "70 grams or two and a half ounces of baking soda,"[23] a small amount of water, and then he cooked it in a microwave. This resulted in 193.57 grams of crack cocaine,[24] which was later put in a clear plastic bag.[25] The whole process was videotaped by the Strike Force.[26]

At some point during the development of the reverse sting, Special Agent Fairbanks stated

---

[18] Transcript of Tape Recording, 16:11–18 (Dec. 18, 2008) (Dkt. No. 146, Ex. 2).

[19] Special Agent Fairbanks testified that they did not ask Dupree to have Jones purchase crack cocaine from the Latino group because they were just runners and had no idea how to convert powder to crack cocaine. Hr. Tr. Vol. IV, 42:17–22. Dupree testified that Blanco could not do the conversion because he was being tested for drugs while in the halfway house. Hr. Tr. Vol. III, 92:24–93:3.

[20] Hr. Tr. Vol. IV, 29:4–20; 44:11–23 (Docket No. 136).

[21] Hr. Tr. Vol. III, 28:12–19; 29:13, 85:24–86:9, 86:25–87:12.

[22] *Id.* at 113:15–114:6. This was approximately 4.77 ounces of powder cocaine.

[23] *Id.* at 114:9–10.

[24] *Id.* at 114:19–23.

[25] *Id.* at 87:20–24; 98:5–6.

[26] *Id.* at 103:14–16.

that the case would be prosecuted federally if Blanco ordered crack.[27] Special Agent Fairbanks testified that to avoid confusion about whether Blanco ordered crack or powder cocaine, he informed the Strike Force to try to get a recording where Blanco made some reference to converting the powder cocaine to crack cocaine.[28] Thus, Dupree was instructed to bring up the issue of crack.

The day after Dupree made the crack, he set up the money exchange with Blanco. Dupree wore a device to record the conversation. Some segments of the tape recording were unintelligible and resulted in some variations between the transcript provided by the government and the transcript provided by Blanco. The following is the government's transcription:

> Dupree: What is it 30, . . . 76 dollar 30, 16, 20 . . . .
>
> Dupree: Do you want me to put this s*** together tomorrow?
>
> Blanco: Please, "E", don't put all that soda on it, please brother.
>
> (Voices overlapping)
>
> Dupree: man . . . I didn't put a lot of soda on that.[29]
>
> Dupree: All right, all right, I'll make it good.[30]

Dupree testified that when he had converted powder to crack previously for Blanco, he had put too

---

[27] Hr. Tr. Vol. IV, 34:18–22.

[28] *Id.* at 8:17–9:1.

[29] This line does not appear in Blanco's transcript, but the other lines are substantively the same. *Compare* Blanco's Transcription (Dkt. No. 143, Ex. 1) *with* Government's Transcription (Dkt. No. 145, Ex. 1).

[30] Transcript of Tape Recording, 5 (Dkt. No. 145, Ex. 1).

much soda in it and Blanco's customers had complained.[31] At the money exchange, Dupree received $3,600 from Blanco.[32] Dupree then added another $25.00 to it, because Dupree owed Blanco that amount, resulting in a total amount from Blanco of $3,625.[33] Dupree gave Blanco's money to Jones, along with an additional $14,500 for Dupree's share. In actuality, the $14,500 was from the Strike Force.[34] Jones added his own money to the pool and purchased powder cocaine from the Latino group when they brought it to his house.[35] The Strike Force subsequently seized $23,420 from the Latino group, of which $14,500 was identified as the Strike Force's money.[36] The total amount of powder found at Jones' house was 441.8 grams.[37]

At the time that Dupree delivered the crack cocaine to Blanco, Blanco could see the contents of the bag. He looked at it for three to four seconds, before he "put it up" in his waist.[38] Dupree testified that three to four seconds is all one needs to tell whether one is receiving powder or crack cocaine.[39] Blanco admits he purchased powder cocaine, but denies he ordered crack cocaine.

Agent Tribe's police report states that Dupree gave Hemmelgarn four ounces of powder

---

[31] Hr. Tr. Vol. III, 92:1–11.

[32] Hr. Tr. Vol. I, 45:12–19 (Dkt. No. 123).

[33] *Id.*

[34] *Id.* at 45:9–19.

[35] *See* Hr. Tr. Vol. IV, 45:22–23.

[36] *Id.* at 45:22–46:2.

[37] *Id.* at 46:3–5.

[38] Hr. Tr. Vol. III, 99:1–19.

[39] *See id.* at 99:18–19.

cocaine to hold for Blanco.[40] Throughout the evidentiary hearing, various members of the Strike Force and Special Agent Fairbanks testified that Jones had only purchased powder cocaine from the Latino group and that Blanco's $3,625 was meant to go towards the purchase of powder cocaine.[41] They further testified, however, that after the powder cocaine was purchased from the Latino group, as a standard practice, Dupree converted Blanco's share of the powder to crack before delivering Blanco's share of the cocaine to him.[42] The Strike Force contends it merely duplicated the standard practice when it interposed itself into the operation.[43] Blanco contends the evidence does not show he ordered crack and that the Strike Force switched his order so they could prosecute him federally and enhance his sentence.

## ANALYSIS

I.     **OUTRAGEOUS GOVERNMENT CONDUCT**

    A.     **Burden of Proof**

When a defendant alleges outrageous government conduct, the defendant bears the burden of proof.[44] The defense is an extraordinary one "that will only be applied in the most egregious

---

[40] Ogden Police Dep't Gen. Offense Hardcopy, 7 (Dkt. No. 146, Ex. 1).

[41] *See, e.g.*, Hr. Tr. Vol. I, 48:5–18, 49:6–11, 69:10–14; Hr. Tr. Vol. III, 17:24–18:1, 20:20–21:1; Hr. Tr. Vol. IV, 12:12–20, 13:8–12.

[42] *See, e.g.*, Hr. Tr. Vol. I, 50:24–51:4; Hr. Tr. Vol. III, 18:19–19:6, 21:17–21, 25:23–26:5, 53:22–54:5, 67:8–18; Hr. Tr. Vol. IV, 25:6–21.

[43] Hr. Tr. Vol. III, 26:5–6; Hr. Tr. Vol. IV, 25:3–6, 35:3–11.

[44] *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994) (citation omitted).

circumstances."[45]  Although the Tenth Circuit "has recognized the defense of outrageous government conduct," it "has never rendered a decision upholding such a claim."[46]  The absence of such a ruling "bears testament to its narrow scope."[47]  Thus, the defendant has a heavy burden to establish the government acted outrageously.

B.  **Elements of Outrageous Government Conduct**

The defendant must show that the government's conduct is "so shocking, outrageous and intolerable that it offends the 'universal sense of justice.'"[48]  To prove this, "the defendant must show either (1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime."[49]  One example is for "the government [to] engineer and direct the criminal enterprise from beginning to end."[50]  "It is not outrageous," however, "for the government to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity."[51]  Moreover, "the government can suggest the illegal activity."[52]  The case of *United States v. Diggs*, demonstrates how these rules have been applied.

In *Diggs*, the defendant alleged the government acted outrageously during a reverse sting

---

[45] *Id.* (citation omitted).

[46] *United States v. Garcia*, 411 F.3d 1173, 1181 (10th Cir. 2005) (citations omitted).

[47] *Id.* (quotation marks and citation omitted).

[48] *Id.* at 1180 (quotation marks and citations omitted).

[49] *Id.* (quotation marks and citation omitted).

[50] *United States v. Diggs*, 8 F.3d 1520, 1525 (10th Cir. 1993) (citation omitted).

[51] *Id.* (citation omitted).

[52] *Id.* (citation omitted).

operation.[53] Diggs was a prominent attorney when police began to suspect that he was involved in drugs. Glen Smith had previously been arrested "for a serious drug offense" and became a government informant in the hope that he would obtain leniency.[54] Smith informed the DEA "that he had sold cocaine to Diggs" and officers had observed Smith talking with Diggs on one occasion.[55] Based on the police's prior suspicion of Diggs and Smith's information, the police decided to target Diggs. The police determined the best way to target him "was to have Smith contact Diggs and offer to sell a quantity of cocaine to him."[56]

Subsequently, two detectives and a chemist with the police department "made about four ounces of crack cocaine at police headquarters which were later released from police custody to Smith for purposes of the 'reverse sting' investigation of Diggs."[57] Smith then contacted Diggs and informed him "that he had some crack cocaine for sale."[58] Diggs replied "that he wanted to buy an ounce of powder cocaine," and the two set up a time to meet at Smith's home.[59] When Diggs did not show, Smith called him "and asked him to come to his house."[60] Smith offered Diggs the crack cocaine at a reduced price. After some discussion over the course of a couple of days, Diggs agreed

---

[53] *Id.* at 1521.

[54] *Id.* at 1522.

[55] *Id.*

[56] *Id.*

[57] *Id.* at 1522–23.

[58] *Id.* at 1523.

[59] *Id.*

[60] *Id.*

to take the crack cocaine because he could sell it through another person.[61] "Diggs was arrested as he departed from Smith's house in possession of the crack cocaine."[62]

Although the police had no information that Diggs had previously sold drugs or that he had been involved in crack cocaine, the Tenth Circuit concluded that the police did not engineer and direct the criminal enterprise from beginning to end, nor did they manufacture a "new crime."[63] Instead, they merely interposed themselves "in Diggs' ongoing criminal activity in drug trafficking" with Smith.[64] Thus, even though the police and a chemist made the crack and then had Smith contact Diggs and raise the issue of crack, their conduct did not rise to the level of outrageousness.

Here, Blanco contends that the Strike Force acted solely based on information from Dupree, which was outrageous because he was unreliable due to trading his cooperation for leniency. Moreover, Blanco contends the Strike Force delivered crack cocaine when he only ordered powder. The evidence does not support these contentions.

Although Dupree did agree to cooperate in the hope of leniency, this does not mean his statements were unreliable. Rather, what Dupree told the Strike Force on November 26, 2008 ended up bearing out. Dupree informed the Strike Force who was involved in the operation, how the transactions were done, and the amounts at play. From this information, the Strike Force successfully interposed itself into the operation and arrested the individuals identified. Had Dupree's

---

[61] *Id.*

[62] *Id.*

[63] *Id.* at 1525 (citation omitted).

[64] *Id.*

information been unreliable, the Strike Force could not have carried out the reverse sting.

Moreover, the Strike Force did not solely rely upon Dupree's statements. Blanco was in a halfway house because of his conviction for possession of crack cocaine. He therefore had a history with that specific drug. Additionally, both Agent Grogan and Agent Burnett heard from sources independent of Dupree that Blanco was involved in crack cocaine again. Finally, in tape-recorded conversations, Blanco said he needed "work" and had asked Dupree not to put so much soda in when he was "putting it together." Thus, before he ever took delivery of the crack cocaine, Blanco himself seemingly referred to crack. While it may be true that Blanco's $3,625 was to purchase four-and-a-half ounces of powder cocaine, the evidence supports that Blanco expected that powder cocaine to be converted to crack before it was delivered to him. Moreover, at delivery, Blanco observed the drugs through a plastic bag and had the opportunity to see that he was accepting crack cocaine rather than powder cocaine.

Blanco nevertheless contends the Strike Force engineered the criminal activity because they instructed Dupree to bring up the issue of crack and actually had him make the crack. The court disagrees. Merely interposing oneself in ongoing criminal activity does not mean one engineers it. It is permissible for law enforcement to suggest the illegal activity, and the Tenth Circuit expressed no concern when two officers and a chemist made crack for a reverse sting operation in *Diggs*. While it is true that the Strike Force did have Dupree, a civilian, make the crack, Dupree did so in furtherance of the Strike Force's reverse sting operation. The crack was made in a controlled setting, where agents were present to supervise and direct Dupree at all times. Viewing this evidence in

totality, the court concludes it does not rise to the level of outrageousness.[65]

### III. OTHER MOTION

Blanco also filed a Motion in Limine for Pre-Trial Determination that Government Must Prove Knowledge of Type of Drug as Element of the Offense. Specifically, Blanco requested that the court instruct the jury that the defendant had to know that he possessed crack cocaine. During the evidentiary hearing on August 2, 2010, the government represented that the issue was resolved because the government had agreed in its briefing that the jury instruction should be given.[66] Based on that representation and the government's brief, the court finds that the motion is now moot.

### CONCLUSION

For the reasons stated above, the court concludes that the government's conduct in this case was not outrageous. It therefore denies Blanco's motion to dismiss.[67] The court further finds that

---

[65] Although the court concludes the government's conduct was not outrageous when it had Dupree make the crack, the court expresses the same sentiment that was stated by Justice Brandeis and quoted by the Tenth Circuit in *United States v. Mosley*:

> Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for the law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means . . . would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

965 F.2d 906, 915 (10th Cir. 1992) (quoting *Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissent)).

[66] Hr. Tr., Vol. III, 4:23–5:9.

[67] Docket No. 92.

Blanco's motion is limine is now moot and therefore denies it.[68]

DATED this 11th day of January, 2011.

BY THE COURT:

_____
Clark Waddoups
United States District Judge

---

[68] Docket No. 94.